IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

NEDRA D. SMITH,                    )
                                   )
    Plaintiff,                     )
                                   )
v.                                 )        No. 20-2828-TMP
                                   )
BRYCE CORPORATION,                 )
                                   )
    Defendant.                     )
_____

### ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
_____

Before the court is Defendant's Motion for Summary Judgment, filed by Bryce Corporation ("Bryce") on January 20, 2023.[1] (ECF No. 70.) Plaintiff Nedra D. Smith filed a response in opposition to the motion on February 24, 2023. (ECF No. 77.) Bryce filed a reply on March 3, 2023. (ECF No. 81.) For the reasons below, the motion is DENIED.

## I.   FINDINGS OF FACT

### A.   Background

This case arises from allegations by plaintiff Nedra Smith that her former employer, Bryce, discriminated against her on the basis of her sex and disability by denying her request to switch

_____

[1]The parties have consented to having the undersigned conduct all proceedings in this case including trial, the entry of final judgment, and all post-trial proceedings. (ECF No. 20.)

from working the night shift to the day shift to accommodate her post-traumatic stress disorder ("PTSD") and anxiety. (ECF No. 31.) Bryce is a company that produces packaging for food, snacks, household items, pet care, and health products. (ECF No. 72-1 at PageID 397.) Its manufacturing facility is located in Memphis, Tennessee. (Id.) Smith began working at Bryce on May 21, 2018. (ECF No. 72-9 at PageID 625.) For the entire time she worked there, her job title was "bag-maker helper." (ECF No. 77-2 at PageID 990.) Smith was terminated from her position on August 12, 2019. (ECF No. 77-2 at PageID 1027.)

## B.   Smith's Alleged Disability

Smith claims that she was disabled by anxiety and PTSD. (ECF No. 77 at PageID 928.) In August of 2018, Smith's husband passed away. (ECF No. 72-1 at PageID 398.) In September of that same year, Smith was raped at night by an individual known to her. (ECF No. 77-5 at PageID 1044.) According to Smith, she then began to experience severe anxiety and uneasiness. (Id.) These symptoms became more pronounced at night. (Id. at PageID 1045.) This made it difficult for Smith to remain calm and focused while working at night. (Id.) It also made it difficult for her to sleep during the day because the increased noise during those hours frequently awoke her. (Id.) After the onset of these symptoms, Smith sought treatment from several mental health professionals. (Id.) Two of

- 2 -

those individuals were deposed as part of this lawsuit: Dr. Tejinder Saini and Dr. Eric Cassius.

In a deposition that took place in 2022, Dr. Saini testified that Smith "had a diagnosis for post-traumatic stress disorder with some issues at her job." (ECF No. 72-19 at PageID 877.) As part of this motion, Bryce has provided the court with two excerpts from Dr. Saini's treatment notes. In one, dated June 11, 2019, Dr. Saini listed Smith's active problems as "Post-traumatic stress disorder, acute." (ECF No. 72-20 at PageID 894.) His observation notes state: "Symptoms not controlled. Symptoms controlled since last visit and on current medication. PTSD [symptoms] remain to the fore. Pt is now moving. She is being evicted. Remains tearful. Legal issues to the fore still. Is living under much duress." (Id.) The record also notes that Smith was prescribed Clorazepate, Lexapro, and Prazosin. (Id.) The second record from Dr. Saini is dated July 30, 2019. (Id. at PageID 889.) There, he wrote that Smith's mood was "euthymic," meaning normal. (Id., ECF No. 72-19 at PageID 878.) Under "Diagnosis," he wrote "Major depressive disorder care plan documented. Discussed concerns about suicide. Observation for suicide risk." (ECF No. 72-20 at PageID 891.) Under "Assessment," he stated that Smith was "Stable." (Id.) Under "Plan of Care," Dr. Saini listed prescriptions for Prazosin, Clorazepate, and Fluoxetine, and wrote "Post-traumatic stress

disorder, acute." (Id. at PageID 892.)

Bryce also deposed Dr. Eric Cassius, a licensed professional counselor. (ECF No. 77-3 at PageID 1037.) According to billing records, Dr. Cassius first saw Smith on July 30, 2019, when she "came in for crisis intervention." (ECF No. 72-21 at PageID 902.) He testified that "[s]he was having a crisis moment where she was feeling like she was falling apart and having a lot of issues." (Id.) Smith continued seeing Dr. Cassius regularly for sixty-minute psychotherapy sessions until November of 2019. (Id. at PageID 917.)

## C.  Bryce's Scheduling Protocol

Bryce operates twenty-four hours a day. (ECF No. 72-1 at PageID 398.) Employees typically work one of three shifts: a first shift from 7:00 a.m. to 3:00 p.m., a second shift from 3:00 p.m. to 11:00 p.m., or a third shift from 11:00 p.m. to 7:00 a.m.[2] (Id.) The parties dispute whether Smith was hired to work on a particular shift. In his affidavit, Richard Williamson, the Vice President of Human Resources at Bryce, states that "Smith was hired to work on the third shift or night shift, 11:00 p.m. to 7:00 a.m." (ECF No. 72-1 at PageID 398.) During Smith's deposition, she was asked, "When you were hired did they tell you which shift you were going

---

[2]The parties refer to the first and second shifts as "the day shift" and the third shift as "the night shift."

to be working on?" (ECF No. 72-9 at PageID 652.) Smith answered, "I was going to be working night shift." (Id.) However, in her declaration, Smith states, "At the time I was hired, I was not assigned solely to any specific shift." (ECF No. 78-6 at PageID 1121.)

Generally, Bryce permits its employees to switch shifts under some circumstances. Williamson's affidavit states:

> Bryce has a policy on "shift bumping" but Bryce is not a union shop and seniority does not control. Pursuant to Bryce's policy, an employee may exercise his/her seniority to bump a less senior employee to a more desirable shift, provided that both employees are in the same job classification and qualified to operate the equipment involved. Additionally, bumping is not allowed in continuous operations to move from alternative shifts. Any requests to bump may be denied at the discretion of the Company. This right is reserved by the company so as not to interfere with the efficient production and staffing needs of the company.

> Work schedules change depending on the production needs of the company on any given day or week. The company reserves the right to move employees around as necessary to meet these production needs. Bryce always tries to consider seniority, but it was never controlling in shift assignments.

(ECF No. 72-1 at PageID 401.) During his deposition, Williamson was asked, "Is there a formal process for requesting certain shifts?" He answered, "I believe there is a written request that would be put in place by the employee requesting a particular shift." (ECF No. 72-17 at PageID 800.) He then testified to the following:

- 5 -

Q. Okay. Does Bryce have a practice of moving people between shifts when a request is made?

A. Really the practice is what is the business need truly. I mean, I - that is really what then dictates, you know, if there is any type of change that can be made, you know, based on being able to run customers efficiently, being able to run certain assets, things of that nature.

Q. Is seniority considered when determining whether or not an employee moves shifts?

A. You know, when all things are considered equal - so if you have looked at, you know, the experience one has, if you look at what assets they have been trained on, things of that nature, if you had two people with basically those same qualifications, you would then potentially use kind of job tenure, you know, how long have you been working that particular position to help with what a tie breaker would be. But we - that is really where that piece would ultimately play if it were to play into a decision.

(ECF No. 77-1 at PageID 978-79.) When asked how Bryce keeps track of seniority, Williamson answered, "Within our company we have dates of employment. We have job tenure dates." (ECF No. 72-17 at PageID 799.) Regarding this system, Smith testified that "I had more seniority than - I think it was like three or four people. So I should have been able to get days." (ECF No. 77-2 at PageID 991.)

At least once during Smith's employment at Bryce, she was allowed to switch shifts after asking for permission from her supervisor, Rob Coleman. (Id. at PageID 410-12.) Williamson agrees in his affidavit, where he states that Smith "was allowed to work day shifts ahead of more senior bag-maker helper in 2018 as Coleman

- 6 -

accommodated her requests for day shift and overtime shifts." (ECF No. 72-1 at PageID 401.) On at least one occasion, Smith requested to work the day shift in order to avoid leaving her daughter home alone. In a text to Coleman, Smith stated, "It's only me and my youngest daughter now living in our home and I don't want to choose between her safety or my livelihood . . . I have absolutely no alternatives and I am so afraid for her to be home along [sic] at night by herself." (ECF No. 72-2 at PageID 424.) When Coleman told her to talk to someone else about the scheduling issue, Smith replied, "Can she just stay in my car in the parking lot if no resolution can be found because I can't leave her home overnight long?" (Id. at PageID 426.) Coleman responded, "I [sic] see if I can get a swap of you [sic] shift for a week." (Id.)

According to the testimony of both Smith and Williamson, one individual, Ben Erickson, was allowed to work solely on the day shift for several months as an accommodation for a physical disability. (ECF No. 77-2 at PageID 1006; ECF No. 77-1 at PageID 980-81; 949-50.) Smith testified that several other male employees were also scheduled for the day shift after requesting it, despite being less senior than her. (ECF No. 77-2 at PageID 1007-10.) This is corroborated by several months of work schedules submitted by Bryce. (ECF No. 72-6.) When asked, Williamson testified that he was not personally aware of these requests, but he did not deny

that they occurred. (ECF No. 77-1 at PageID 980-81.)

**D.   Smith's Requests for Accommodation**

Smith began a period of short-term disability leave from Bryce on February 25, 2019. (ECF No. 72-13 at PageID 772; 72-9 at PageID 670.) This leave of absence was approved by Bill Morrow, who at the time was the benefits manager at Bryce. (ECF No. 72-7 at PageID 599.) During this period of leave, Smith presented Bryce with a note from a behavioral health specialist substantiating her medical issues. (ECF No. 72-8 at PageID 611.) The note stated: "Client is diagnosed with post-traumatic stress disorder. Her symptoms are: hyper-vigilance, nightmares, tearfulness, feelings of hopelessness, [illegible], anxiety, and depression." (Id.) The specialist wrote that Smith was undergoing "medication monitoring by the psychiatrist and ongoing group therapy." (Id.) Under a section labeled "Describe limitations preventing employee from performing one or more essential job functions," the note said, "Client's hypervigilance, ongoing trauma, depression, and anxiety, and difficulty [illegible] with symptoms prevent her from being able to perform job functions." (Id.) Over the next several months, Smith's psychiatrist, Dr. Saini, wrote notes stating that a psychiatric disability prevented Smith from returning to work. (ECF No. 72-13 at PageID 773-76.) Smith provided these notes to Bryce and remained on short-term disability leave until August of

- 8 -

2019. (ECF No. 72-9 at PageID 671.) On July 30, 2019, Dr. Saini provided Smith with a note stating that she would be able to return to work without restrictions on August 5, 2019. (ECF No. 72-14 at PageID 777.) According to Smith, the reason Dr. Saini did not explicitly restrict her to the day shift was that "I told him that wasn't going to be a problem because I had more seniority than the guys on the day shift. So he didn't put that there." (ECF No. 77-2 at PageID 997.)

Smith then learned that upon her return to work, she would again be scheduled to work on the night shift. (ECF No. 77-2 at PageID 997, 1012.) Although she had not been working nights during her short-term disability leave, she testified: "I knew that was going to be a problem. I have problems sleeping at night. Any little sound wakes me up. There is way more sounds in the daytime." (Id. at PageID 1023.) She approached Morrow and told him about her medical concerns. (Id. at PageID 997-98.) Smith testified:

> And [Morrow] was like, there was a guy on day shift right now they gave this accommodation for, so I'm pretty sure if you go to your counselor and bring something -- he was like, you know, this thing that Rob is doing, it's not right, and you need to let somebody know.
>
> So he kind of convinced me to talk to Mr. Richard [Williamson] and Ms. Hatfield. And he told me there was a guy already on days that they had made the accommodation for, and if I could get the medical documentation that he was pretty sure that they would accommodate me and stuff, too.

- 9 -

(Id. at PageID 108.)

After this conversation with Morrow, Smith met with Dr. Cassius for the first time on July 30, 2019. (ECF No. 72-21 at PageID 902.) That day, Smith gave Dr. Cassius a letter to explain "what was going on with her." (Id. at PageID 904.) The letter, which at times is difficult to read because it appears to have been recopied several times, states:

> My HR said I can't get FMLA and he said if you would write something saying I can only work day shift and if you would tell them time and dates of my appointment that would help me.
>
> . . .
>
> I need your [illegible]. If you do not help I will probably lose my job and will not be able to get the counseling I need. I need counseling and I really believe you can help me.
>
> The Problem Is
> I am facing harassment from my boss and one of the things he is doing is putting me on the night shift even though I have more seniority than 4 of the people he has put on the day shift. I have received threats from him and he has lived up to them. He even sent me a text message saying he was out of line.
>
> Why Is Nightshift a Problem for Me
> I already have problems sleeping and I take sleep meds but what happens is, people make noise during the day and any little noise wakes me up, I am still traumatized by my rape and so I end up laying in bed trying to sleep because I am tired and by the time I'm able to get to sleep I get little sleep and wake up tired and sleepy and I would fall asleep a lot at work.
>
> Why Am I Writing
> Whenever I have a lot of information it gets jumbled up

in my head and whenever my anxiety hits my heart
[illegible], I feel my heart in my throat, I get
butterflies in my belly, my brain and body feels like
its shutting down or I can't get my information or words
out, and it depends on the situation but I feel unable
to move anything, and I be screaming inside.

(ECF No. 72-22 at PageID 920.) On August 2, 2019, Dr. Cassius

provided Smith with a doctor's note stating:

Nedra Smith is a client of the undersigned, she
came to our office due to severe panic, anxiety,
depression and grief due to the passing of her husband
and subsequent trauma related to being raped.

Mrs. Smith is receiving and is compliant with
treatment, from this counselor and an MD.

It is the belief of this counselor that Mrs. Smith
would benefit greatly from being moved from her
nightshift to a day shift. This would reduce her anxiety
and make her much more productive at work.

Mrs. Smith will also need to be able to attend
weekly, progressing to bi-weekly therapy sessions during
office hours for a period of 3-6 months.

(ECF No. 77-6 at PageID 1047.) During his deposition, Dr. Cassius

was asked if he had a recollection of providing the letter. (ECF

No. 72-21 at PageID 906.) Dr. Cassius replied, "Only from my

notes." (Id.) However, he testified that "the only thing I know is

that she's having trouble sleeping [on the night shift]." (Id. at

PageID 908.) Counsel then asked Dr. Cassius if he had discussed

the harassment that Smith mentioned in her letter. (Id. at PageID

901.) Dr. Cassius testified, "I don't remember the details." (Id.)

However, he stated that it "was more than likely my assumption"

that "putting her on the day shift would assist with any kind of anxiety she may be suffering from harassment of her boss." (Id.) Neither Smith's sleep problems nor potential harassment from her boss were mentioned in Dr. Cassius's note to Bryce. (ECF No. 77-6 at PageID 1047.)

Smith then met with Williamson and Allison Hatfield, Bryce's human resources manager, on August 2, 2019. (ECF No. 72-1 at PageID 400.) According to Williamson, Bryce considered Dr. Cassius's note to be a "recommendation" that "did not prevent [Smith] from being able to work nights." (ECF No. 77-1 at PageID 972.) In his affidavit, Williamson states:

> At this meeting Smith presented us with a note from Eric Cassius ("Cassius"). This note from Cassius stated that Smith would benefit from working days. Hatfield asked Smith how a switch to days would benefit her, to which Smith responded it would keep her from having to leave her then 17 year old daughter home alone.
>
> Hatfield responded that her issue was one of childcare and that we could not accommodate that. Smith never informed us of the nature of her condition or how her condition might affect her working nights.

(ECF No. 72-1 at PageID 400.) However, Smith testified that during this conversation she did not discuss wanting to avoid leaving her daughter at home. (ECF No. 77-2 at PageID 1023-24.) According to Smith, she informed the two that she was having trouble sleeping and that she knew working nights would be a problem. (Id. at PageID 1022-23.)

- 12 -

On August 7, 2019, Smith spoke on the phone with Hatfield. (ECF No. 77-9 at PageID 1095.) Smith then followed up via email, stating:

> Hi Allison I am confused about what you said when I spoke to you on the phone today. Can you clarify for me when I can return back to work and what the stipulations are in writing? What does the doctor's note have to say in order for me to keep my job? Also, what your finding were [sic] concerning the harassment I reported to you and Richard on Friday concerning Rob Coleman? Also, thank you for covering the days you scheduled me off with my vacation days. I meet with my doctor tomorrow; therefore, I really need to know as soon as possible what is required.

(Id.) Hatfield responded:

> In your letter from Eric Cassius, he mentions "that you would benefit greatly being moved from night shift to a day shift." Due to this statement, we need something in writing stating that you are able to work either shift.
>
> We did not find any evidence that there was any form of harassment regarding Rob Coleman.

(Id.) On August 8, Smith emailed Hatfield and told her that "I have not been able to get a doctor's note yet because this is short notice. I have an appointment scheduled for Saturday. Can you extend the request to give me more time?" (ECF No. 72-16 at PageID 782.) Hatfield responded, "I will extend the request until Saturday." (Id.)

Although there is no specific testimony regarding when Smith met with Dr. Cassius a second time, she testified that she "couldn't get Mr. Cassius to recant . . . on his medical opinion

. . . He felt like I would benefit from working day shift." (ECF No. 77-2 at PageID 1031.) Smith then met with Dr. Saini. (Id. at PageID 1026-27.) After this meeting, Dr. Saini provided Smith with a doctor's note that stated: "It is medically necessary for the pt to work the 7-3 or 3-11 work shifts, but not the 11-7 work shift." (ECF No. 77-8 at PageID 1094.) During his deposition, Dr. Saini was asked about why he changed his recommendation regarding Smith's restrictions. When counsel asked, "Do you recall any changes in Ms. Smith that you noted on August 10, different from July the 30th?" Dr. Saini replied, "I do not recall in my memory at this point the visit, beyond going by [Smith's medical records]." (ECF No. 72-19 at PageID 882.) Smith never provided this note to anyone at Bryce. (ECF No. 72-1 at PageID 401.) Instead, on August 12, 2019, Smith emailed Hatfield again. In her email, she said:

> I haven't heard anything from Rob concerning my schedule yet. Am I going to be allowed to return back to work today? My therapist would not recant on his medical opinion. I went to my other doctor who works with him on Saturday and he feels the same way, so I was not able to get anything from him that differed in medical opinion. I have a statement from him as well.

(ECF No. 77-10 at PageID 1096.) According to Smith, the "other doctor" she was referring to in this email was Dr. Saini. (ECF No. 77-2 at PageID 1026.) Hatfield responded, "Give me a call when you can," and gave Smith her phone number. (ECF No. 77-10 at PageID 1096.)

Smith called Hatfield. (ECF No. 77-2 at PageID 1027.) She recorded their phone conversation. A copy of that recording was filed in this case as an exhibit. (ECF No. 86.) Their full conversation was as follows:

Hatfield: Human resources.

Smith: Yes, uh, Allison, this is Nedra Smith calling.

Hatfield: Hi, Nedra. I got your email messages. So, what you're saying is the doctor's not lifting your restrictions?

Smith: No, he's not.

Hatfield: Okay. Um, well, because of that, um, we're not able to continue employment unfortunately. So your employment would end effective the ninth.

Smith: Okay.

Hatfield: Alright. So we'll process that in the system and I'll have Wendy send a letter out to you, okay?

Smith: Okay, thank you.

Hatfield: Uh huh, bye bye.

Smith: Bye bye.

(Id.) After this phone call, Smith received a separation notice from Bryce. (ECF No. 77-2 at PageID 1030; ECF No. 77-11 at PageID 1097.) Under "explain the circumstances of this separation," the notice says "Voluntary Resignation." (ECF No. 77-11 at PageID 1097.) Smith denies voluntarily resigning. (ECF No. 77-2 at PageID 1030.) Although not entirely clear from the parties' submissions,

- 15 -

the "voluntary resignation" designation appears to have arisen from some confusion within the chain of command at Bryce. Williamson testified that his initial understanding of why Smith was fired was because she missed work for three days without contacting Bryce. (ECF No. 77-1 at PageID 972-73.) He then testified to the following:

> Q.   What three days did she not show up for work?
>
> A.   At the time this [interrogatory answer] was put together, that's what we believed to be the course of events. We have since later learned differently that there was communication between Nedra and Allison. But at the point where Nedra and Allison spoke on August the 7th indicating that the investigation [of Rob Coleman], unrelated to Cassius, was completed, that's when Allison informed Nedra to return. She can return to her shift but that we requested the documentation that she could work any shift.
>
> Q.   So it is your testimony today that Ms. Smith did not -- was not terminated and classified as voluntary resignation because she missed three days of work; is that correct?
>
> A.   That is correct.

(Id. at PageID 173.)

**E.   The Present Lawsuit**

After being terminated, Smith filed a Charge of Discrimination with the EEOC and the Tennessee Human Rights Commission. (ECF No. 1 at PageID 9.) The EEOC provided Smith with a right to sue letter on August 18, 2020. (Id. at PageID 8.) Smith filed suit on November 13, 2020. (Id.) She then filed an amended

complaint on December 13, 2021. (ECF No. 31.) In this complaint, Smith alleged that Bryce had violated both the Americans with Disabilities Act ("ADA") and Title VII of the Civil Rights Act of 1964 ("Title VII") by engaging in sex and disability discrimination. (Id.) Regarding the disability claim, Smith states that Bryce engaged in discrimination by terminating her rather than accommodating her disability by permitting her to work on the day shift. (Id.) She further claims that she was subject to disparate treatment on the basis of her sex. (Id.)

On January 20, 2023, Bryce filed the present motion for summary judgment. (ECF No. 70.) According to Bryce, "[w]hether Plaintiff had a disability that required accommodation under the ADA is the subject of this lawsuit." (Id.) While Bryce concedes that Smith suffered from PTSD and anxiety, it argues that these impairments are not disabilities entitled to protection under the ADA because they did not substantially limit her ability to perform a major life activity. (Id.) Rather, it contends that any limitations that Smith experienced were due to her inability to work with a particular supervisor. (Id.) Further, it asserts that there was no failure to accommodate because Smith's request to work the day shift was related to childcare, not her disability. (Id.) Bryce argues that its decision to terminate Smith was non-discriminatory because "Plaintiff's employment was terminated

- 17 -

after she repeatedly refused to return to work when advised that Bryce could not grant her request to work day shift." (Id.) Finally, Bryce asserts that Smith has not presented enough evidence to support her sex discrimination and retaliation claims. (Id.)

Smith filed her response to the motion on February 24, 2023. (ECF No. 77.) She argues that she is disabled for the purposes of the ADA because her PTSD and anxiety substantially impair her ability to work, perform manual tasks, and sleep. (Id. at PageID 937.) Smith asserts that Bryce failed to grant her requests for reasonable accommodation for these disabilities and retaliated against her for seeking them. (Id. at PageID 939, 941.) She alleges that Bryce's reason for terminating her was pretextual, stating that "Defendant has identified three separate and distinct reasons for Ms. Smith's discharge and varying times. None of the three reason[s] has any reliable basis in fact." (Id. at PageID 941-42.) Finally, she argues that she has demonstrated a *prima facie* case for sex discrimination because she was denied an accommodation that was granted to a similarly-situated male employee. (Id. at PageID 942.)

Bryce filed a reply to Smith's response on March 10, 2023. (ECF No. 83.) There, Bryce emphasizes that Smith's issues with working the night shift were related to harassment and childcare, not a disability, and that her PTSD did not substantially impair

- 18 -

her in any way. (Id.) It argues that Smith was terminated because she "refused to return to work," and that she has not demonstrated that this rationale was pretextual. (Id.) Finally, it reiterates that Smith has not met the elements necessary to create a genuine dispute of sex discrimination or retaliation. (Id.)

## II.  ANALYSIS

### A.  Legal Standard

Pursuant to Federal Rule of Civil Procedure 56(a), "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden to "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." Goins v. Clorox Co., 926 F.2d 559, 561 (6th Cir. 1991).

When analyzing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party. Huckaby v. Priest, 636 F.3d 211, 216 (6th Cir. 2011) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). In doing so, the court may not make credibility determinations or weigh the evidence. Jordan v. Kohl's Dep't Stores, Inc., 490 F. App'x 738, 741 (6th Cir. 2012) (citing Anderson, 477 U.S. at 255). Rather, it must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Block v. Meharry Med. Coll., 723 F. App'x 273, 277 (6th Cir. 2018) (quoting Anderson, 477 U.S. at 251-52)).

**B.   ADA Claims**

    1.   Disability Discrimination

Smith's first claim is that she was subject to disability discrimination. Under the ADA, employers may not "discriminate against a qualified individual on the basis of disability" regarding the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Disability discrimination claims may be based on either direct or indirect evidence. Lovell v. Champion Car Wash, LLC, 969 F. Supp. 2d 945, 950 (M.D. Tenn. 2013). "[A] plaintiff need only prove one or the other, not both." Hedrick v. Western Reserve Care Sys., 355 F.3d 444, 453 (6th Cir. 2004). When making

a case based on direct evidence, the plaintiff must produce "evidence which, if believed, requires the conclusion that unlawful discrimination was [the] motivating factor in the employer's actions. It does not require the fact finder to draw any inferences to reach that conclusion." Sharp v. Aker Plant Servs. Grp., Inc., 726 F.3d 789, 798 (6th Cir. 2013) (quoting Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 570 (6th Cir. 2003) and Amini v. Oberlin Coll., 440 F.3d 350, 359 (6th Cir. 2006)) (quotation marks omitted). In this case, Smith does not assert that she has direct evidence of discrimination. (ECF No. 78.) Instead, she argues that her claims are supported by indirect evidence.

When a disability discrimination claim is based on indirect evidence, it is analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Babb v. Maryville Anesthesiologists P.C., 942 F.3d 308, 319 (6th Cir. 2019). Under this framework, Smith has an initial burden of establishing a *prima facie* case of disability discrimination by a preponderance of the evidence. E.E.O.C. v. Ford Motor Co., 782 F.3d 753, 767 (6th Cir. 2015). To do so, Smith must show that 1) she has a disability; 2) she was otherwise qualified for her position at Bryce; 3) she suffered an adverse employment decision; 4) Bryce knew or had reason to know of her disability; and 5)

similarly-situated employees were treated more favorably. Brubaker
v. W. & S. Fin. Grp., Inc., No. 1:13-CV-866, 2015 WL 4743046, at
*3 (S.D. Ohio Aug. 10, 2015) (citing Plant v. Morton Intern., Inc.,
212 F.3d 929, 936 (6th Cir. 2000) and Hopkins v. Elec. Data Sys.,
196 F.3d 655, 660 (6th Cir. 1999)). Smith must put forth sufficient
evidence for a reasonable jury to find in her favor on each of
these elements. Haley v. Cmty. Mercy Health Partners, No. 3:11-
cv-232, 2013 WL 322493, at *6 (S.D. Ohio Jan. 28, 2013) (citing
Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 661 (6th Cir.
2000)). If the court determines that Smith has created a genuine
dispute as to each prong of her *prima facie* case, the burden then
shifts to Bryce to articulate a nondiscriminatory reason for its
action. Ford Motor, 782 F.3d at 767 (citing St. Mary's Honor Ctr.
v. Hicks, 509 U.S. 502, 507 (1993)). If Bryce can do so, the burden
shifts back to Smith to establish that the given reason is a
pretext for discrimination. Id.

At the outset, Bryce does not appear to contest that Smith
was qualified for her position at its facility. (ECF No. 71.) For
the purposes of Smith's ADA claim, Bryce also does not dispute
that Smith was subject to an adverse employment action, nor could
it. Smith was terminated, and it is well-settled law that
termination is an adverse employment action. Kuhn v. Washtenaw
Cnty., 709 F.3d 612, 625 (6th Cir. 2013) (citing Michael v.

- 22 -

Caterpillar Fin. Servs. Corp., 496 F.3d 584, 593 (6th Cir. 2007)). Bryce's briefs focus almost exclusively on the first prong of the *prima facie* standard: whether Smith was disabled.

### a.  Smith's Alleged Disability

According to Bryce's motion, "this case is fairly straightforward, did Plaintiff suffer from a condition that substantially limited one or more major life activities." (ECF No. 83 at PageID 1269.) This language refers to the ADA's definition of disability: "A physical or mental impairment that substantially limits one or more of the major life activities of such individual."[3] 42 U.S.C. § 12102(1)(A). While Bryce concedes that Smith suffered from PTSD and anxiety, it contends that these conditions did not substantially limit Smith such that they rendered her disabled for the purposes of the ADA. (ECF No. 71.)

The ADA sets forth a non-exhaustive list of activities that are considered "major life activities." These include: "caring for oneself, performing manual tasks, seeing, hearing, eating sleeping, walking, standing, lifting, bending, speaking,

---

[3]Under the ADA, an individual is also considered disabled if they have "a record of" an impairment that substantially limits one or more major life activities or are "regarded as having such an impairment." Wells v. Cincinnati Children's Hosp. Med. Ctr., 860 F. Supp. 2d 469, 477 (S.D. Ohio 2012) (quoting 42 U.S.C. § 12102(1)). Smith does not argue that these definitions apply to her, and therefore the undersigned need not consider them.

breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). The burden is on the plaintiff to identify both the "impairment at issue and the major life activity that it impacts." Hentze v. CSX Transp., Inc., 477 F. Supp. 3d 644, 660 (S.D. Ohio 2020) (citing Johnson v. Cleveland City Sch. Dist., 344 F. App'x 104, 111 (6th Cir. 2009)). According to Smith, her mental impairments – PTSD and anxiety – substantially limited the major life activities of sleeping, working, and performing manual tasks. (ECF No. 77.) Smith need only show that one major activity was substantially limited to create a *prima facie* showing that she was disabled. 42 U.S.C. § 12102(3).

Whether an impairment "substantially limits" an individual is a relative assessment. Darby v. Childvine, Inc., 964 F.3d 440, 445 (6th Cir. 2020). "[W]e determine whether a disability substantially limits major life activities through comparison of the person claiming a disability to most people in the general population." Harrison v. Soave Enters. L.L.C., 826 F. App'x 517, 523 (6th Cir. 2020) (citing Hostettler v. Coll. of Wooster, 895 F.3d 844, 854 (6th Cir. 2018)) (internal quotations omitted). "An impairment need not prevent, or significantly or severely restrict . . . a major life activity to be substantially limiting." Id. (internal quotations omitted). Importantly, the ADA was amended in

- 24 -

2008 by the Americans with Disabilities Act Amendments Act ("ADAAA"), in which Congress "instructed courts to interpret the term 'disability' broadly, given the ADA's remedial purpose." Hentze, 477 F. Supp. 3d at 660 (citing Hostettler, 895 F.3d at 853.) In light of the ADAAA, the EEOC guidelines now direct courts to interpret and apply the term "substantially limits" to require "a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA." 29 C.F.R. § 1630.2(j)(1)(iv). Unlike before, "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures." 29 C.F.R. § 1630.2(j)(1)(vi). Using this construction, "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage" and "is not meant to be a demanding standard." Hostettler, 895 F.3d at 854 (quoting 29 C.F.R. § 1630.2(j)(1)(i)).

In line with Congress's intent to "provide more generous coverage and application of the ADA's prohibition on discrimination," the EEOC guidelines list several "predictable assessments," noting that "the individualized assessment of some types of impairments will, in virtually all cases, result in a determination of coverage." 29 C.F.R. § 1630.2(j)(3)(ii). PTSD is specifically identified as one such impairment. Id. According to

the guidelines, "it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated . . . post-traumatic stress disorder . . . substantially limit[s] brain function." 29 C.F.R. § 1630.2(j)(3)(iii).

The undersigned will first determine if there is a genuine dispute as to whether Smith's impairments substantially limited her ability to sleep. The Sixth Circuit has historically been unreceptive toward claims of disability that hinge on impairments that limit sleeping. In one unpublished 2002 opinion, the Sixth Circuit applied the pre-ADAAA definition of "substantial limitation" and held that "[g]etting between two and four hours of sleep a night, while inconvenient, simply lacks the kind of severity we require of an ailment before we will say that the ailment qualifies as a substantial limitation under the ADA." Boerst v. Gen. Mills Operations, Inc., 25 F. App'x 403, 407 (6th Cir. 2002). Similarly, in an unpublished 2009 opinion, the Sixth Circuit held that a plaintiff who "was sleeping three or fewer hours five days per week, while sleeping longer the other two days" was "not substantially limited in the major life activity of sleep and, in turn, was not actually disabled under the ADA." Simpson v.

Vanderbilt Univ., 359 F. App'x 562, 567 (6th Cir. 2009).[4] The Simpson court further stated that "even if we were to find that fewer than three hours of sleep per night amounts to a substantial limitation, Simpson's uncorroborated testimony about his sleep habits is not enough to raise a genuine issue of material fact as to whether his sleep was substantially limited." Id. The pre-ADAAA Sixth Circuit also declined to find that more mild cases of sleeplessness constituted disabilities. See, e.g., Verhoff v. Time Warner Cable, Inc., 299 F. App'x 488, 492 (6th Cir. 2008) (affirming the district court's finding that a plaintiff who was limited to roughly five hours of sleep per night was not substantially limited); Swanson v. Univ. of Cincinnati, 268 F.3d 307, 316 (6th Cir. 2001) (holding that "[w]hile less than five hours sleep is not optimal, it is not significantly restricted in comparison to the average person in the general population"); Linser v. State of Ohio, Dep't of Mental Health, 234 F.3d 1268 (6th Cir. 2000) (ruling that a plaintiff who slept five hours a night and woke up in the middle of the night twice a week failed to create a genuine issue of material fact because her medication

---

[4]Although Simpson was decided in 2009, the district court ruling it considered was decided before the ADAAA went into effect, and the Sixth Circuit therefore did not apply the ADAAA in its analysis. Simpson v. Vanderbilt Univ., No. 3:07-CV-1131, 2008 WL 11432189, at *8 (M.D. Tenn. Nov. 25, 2008).

curbed her symptoms and her sleep disruptions happened
infrequently). Many of these cases also relied on the holding of
Sutton v. United Airlines, Inc., 527 U.S. 471, 482 (1999), which
held that courts must take into account mitigating measures when
determining whether a plaintiff is disabled and which was
statutorily overturned by the ADAAA. See Boerst, 25 F. App'x at
407; Swanson, 268 F.3d at 315; Verhoff, 299 F. App'x at 492.

The Sixth Circuit has discussed substantial limitations on
the major life activity of sleeping only once since the ADAAA was
enacted. In Neely v. Benchmark Family Services, 640 F. App'x 429
(6th Cir. 2016), the court reviewed a grant of summary judgment
against a plaintiff who had alleged sleep apnea as a disability.
Id. at 433. In that case, the plaintiff testified that he had
suffered from sleeping problems for many years and that he
sometimes only got two or three hours of restful sleep each night.
Id. at 430. No doctor diagnosed the plaintiff with sleep apnea;
one attributed his sleeping issues to "horrible sleep hygiene," as
the plaintiff slept "basically when he [felt] like it . . . usually
going to bed around 3 a.m. and sleeping through until 1 p.m." Id.

In analyzing the plaintiff's claim, the Neely court cited to
its previous cases and observed that:

> Our circuit precedent has consistently held that
> sleeping problems like Neely's — "getting only 2 to 3
> hours of restful sleep per night, falling into micro

> sleeps during the day . . . snoring, and extreme
> difficulty breathing while sleeping," . . . fail to
> constitute a substantial limitation on a major life
> activity.

Id. at 434. The court then observed that the ADAAA relaxed the standard for "substantial limitation," writing that it fully recognized that "the term 'substantially limits' shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the [2008 Amendments]." Id. at 434 (quoting 29 C.F.R. § 1630.2(j)(1)(iv)) (alteration in original). However, the court went on to state that "a lesser burden is a burden nonetheless." Id. at 434-35. It agreed with the district court that "[w]hile a diagnosis might not be absolutely necessary [to establish a record of impairment], in this situation, some diagnosis must explain the duration or severity of the impairment." Id. at 435 (alteration in original). The court held that the plaintiff's "self-described symptoms to his physicians, without corroborating medical evidence or any diagnosis are insufficient to establish a substantial limitation on a major life activity." Id. The Neely court did not appear to reach the question of whether the plaintiff's symptoms would have constituted a substantial limitation post-ADAAA had they been supported by medical evidence or a diagnosis.

The many district courts that have decided the issue have found that a broad range of sleep problems qualify as substantial impairments under the ADAAA. For example, in Williams v. AT&T Mobility Services, LLC, 186 F. Supp. 3d 816 (W.D. Tenn. 2016), the court granted summary judgment in favor of the plaintiff because medical evidence of her severe depression and "its effects on her sleeping" was sufficient to establish that she was disabled. Id. at 821, 826. In Garibay v. Hamilton County, Tennessee, 496 F. Supp. 3d 1140 (E.D. Tenn. 2020), the court similarly held that a plaintiff who was diagnosed with PTSD that led to difficulty sleeping and nightmares had created a genuine issue of material fact as to whether he was disabled. Id. at 1142, 1147. In Dye v. Thomas More University, Inc., No. 2:19-CV-087-CHB, 2021 WL 4006123 (E.D. Ky. Sept. 2, 2021), the court held that a plaintiff who had been diagnosed with major depression, generalized anxiety disorder, and PTSD, and who experienced insomnia when she was "very anxious," had raised a genuine dispute as to whether she was substantially limited. Id. at *8. All three cases dealt with impairments, like Smith's, that are specifically set forth in the EEOC guidelines as "predictable assessments" for which "it should easily be concluded that" they "substantially limit the major life activities indicated." 29 C.F.R. § 1630.2(j)(3)(iii). According to the Williams court, this inclusion "create[d] a strong presumption

. . . that Plaintiff's severe depressive disorder and anxiety substantially affected a wide range of major life activities as compared to persons not suffering from those same impairments." 186 F. Supp. at 825. However, even in cases of sleeplessness where the plaintiff's impairment is not one singled out by the EEOC guidelines, courts have found for the plaintiff. See Wanner v. Under Armour, Inc., No. 3:18-CV-00767, 2020 WL 7489464, at *1 (M.D. Tenn. Dec. 21, 2020) (ruling that a reasonable jury could find that a plaintiff diagnosed with adjustment disorder who suffered from insomnia was disabled); Bridgewater v. Mich. Gaming Control Bd., 282 F. Supp. 3d 985, 988 (E.D. Mich. 2017) (holding that a plaintiff who suffered from a dermatological disease that caused "severe disruption" of his sleep was disabled); Reeder v. Cnty. of Wayne, 177 F. Supp. 3d 1059, 1077 (E.D. Mich. 2016) (finding that a plaintiff who was diagnosed with situational anxiety, and who suffered from sleeplessness as a result, had presented sufficient facts to survive summary judgment).

Taking into account the ADAAA's mandate of broad coverage, the EEOC guidelines' strong presumption that Smith's PTSD "substantially affected a wide range of major life activities as compared to persons not suffering from that impairment," and the majority of courts that have found varying levels of sleeplessness to constitute substantial impairments, the undersigned finds that

- 31 -

Smith has alleged sufficient facts to create a genuine issue as to whether she was disabled. <u>Williams</u>, 186 F. Supp. at 825. During her deposition, Smith testified that she has trouble sleeping because "any little sound wakes me up" and that these symptoms are exacerbated during the daytime because "there is way more sounds in the daytime." (ECF No. 77-2 at PageID 1023.) Her contemporaneous statements made during her employment at Bryce corroborate her testimony. In July of 2019, she wrote to her therapist that "people make noise during the day, and any little noise wakes me up," and that as a result, "I end up lying in bed trying to sleep because I'm tired and by the time I'm able to get to sleep I get little sleep and wake up tired and sleepy and would fall asleep a lot at work." (ECF No. 77-12 at PageID 1098.) These remarks are supported by Smith's behavioral health specialist, who diagnosed Smith with PTSD with symptoms of hypervigilance and nightmares. (ECF No. 72-8 at PageID 611.) Smith's therapist, Dr. Cassius, also testified that Smith's "trouble sleeping" played a role in his opinion that she would "benefit greatly" from working on the day shift. (ECF No. 72-21 at PageID 908.) Smith was also prescribed medication to treat her sleeplessness. (ECF No. 72-20 at PageID 892, 894.) Taken together, these facts create a genuine dispute as to whether

Smith's PTSD substantially limited the major life activity of sleeping compared to most people in the general population.[5]

> b. *Whether Bryce Knew or Had Reason to Know Smith Was Disabled*

Bryce also appears to dispute that it knew or had reason to know that Smith was disabled. In its motion, Bryce writes:

> Here Plaintiff presented for work on August 2, 2019 asking that Bryce allow her to work days and not nights. Defendant probed Plaintiff to understand how her request would allow her to perform her job. Plaintiff's explanation was that working days would allow her not to leave her daughter at home alone. The Plaintiff's issue here is one of making appropriate childcare arrangements for her daughter, it has absolutely nothing to do with any disability that she may suffer.

(ECF No. 71.) It is clear that the parties disagree about what was said in the conversations surrounding Smith's request to work the day shift. According to Morrow, Smith presented him with a doctor's note that allowed her to return to work without restrictions. (ECF No. 72-7 at PageID 600.) He stated Smith "expressed to me that she would prefer not working nights" but "she did not explain to me why she did not want to work nights." (Id. at PageID 601.) However, according to Smith, at this meeting she spoke to Morrow about her "medical concerns" and Morrow responded by telling her to seek an accommodation. (ECF No. 77-2 at PageID 998.) Smith then approached

---

[5]Because of this finding, the undersigned need not reach the issue of whether Smith's impairments substantially limited the other major life activities of working and manual tasks.

Dr. Cassius and asked him to "write something saying I can only work day shift." (ECF No. 72-22 at PageID 919.) Dr. Cassius provided Smith with a doctor's note stating that he was treating her for "severe panic, depression, and grief due to the passing of her husband and subsequent trauma related to being raped" and that working during the day shift would reduce her anxiety. (ECF No. 72-23 at PageID 921.) At a subsequent meeting, Smith presented that note to Hatfield and Williamson. According to Williamson, Hatfield "asked Smith how a switch to days would benefit her, to which Smith responded it would keep her from having to leave her then 17 year old daughter home alone." (ECF No. 72-1 at PageID 400.) He also states that "Smith never informed us the nature of her condition or how her condition might affect her working nights." (Id.) Again, Smith disagreed, saying "I told them I was having problems sleeping." (ECF No. 77-2 at PageID 1022.) The emails between Hatfield and Smith that discuss the restriction do not reference childcare. (ECF No. 72-16 at PageID 779-88.)

Viewing this evidence in the light most favorable to Smith, the undersigned finds there is a genuine dispute as to whether Bryce knew or should have known that Smith was disabled. Setting aside the conflicting evidence about what was said during the two meetings, Bryce's leadership was in possession of a doctor's note stating that Smith was being treated for severe panic, anxiety,

depression, and grief. (ECF No. 72-23 at PageID 921.) They received this note after Smith had already taken a period of short-term disability leave relating to her PTSD. (ECF No. 72-8 at PageID 611.) Additionally, during the phone call in which Smith was terminated, Hatfield said it was because Smith's doctor wouldn't lift her accommodations.[6] (ECF No. 79.) Based on this evidence, a reasonable juror could find that Bryce knew that Smith was disabled.

> c.  *Treatment of Similarly-Situated Employees*

To satisfy the last element of her *prima facie* case, Smith must show that similarly-situated, non-protected employees were treated more favorably. Welsh v. Automatic Data Processing, Inc., 954 F. Supp. 2d 670, 680 (S.D. Ohio 2013) (citing Hopkins, 196 F.3d at 660). When demonstrating that an employee is similarly situated, a plaintiff "needn't show an exact correlation between herself and the proposed comparators," but "must show similarities in 'all relevant respects.'" Goldblum v. Univ. of Cincinnati, 62 F.4th 244, 255 (6th Cir. 2023) (quoting Bobo v. United Parcel Serv., Inc., 665 F.3d 741, 751 (6th Cir. 2012)). Comparators "must have dealt with the same supervisor, have been subject to the same

---

[6]Because Smith does not argue that she has direct evidence of discrimination, the undersigned will not address whether this phone call might constitute direct evidence.

standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them." <u>Younis v. Pinnacle Airlines, Inc.</u>, 610 F.3d 359, 364 (6th Cir. 2010) (quoting <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 583 (6th Cir. 1992)).

Smith alleges that she was treated less favorably than similarly-situated employees because Bryce refused to schedule her on the day shift after her short-term disability leave. During her deposition, Smith testified that several other employees were permitted to work on the day shift despite having less seniority. (ECF No. 72-9 at PageID 661-65.) Like Smith, these individuals were employed as bag-maker helpers. (<u>Id.</u>) They worked under Rob Coleman, the same person who supervised Smith. (<u>Id.</u>) As bag-maker helpers, the employees were subject to the same shift-bumping policy as Smith, where both production needs and seniority were relevant considerations. (ECF No. 72-1 at PageID 401.) Work schedules submitted by Bryce corroborate Smith's observation that certain co-workers were consistently permitted to work during the day, either on the 8 a.m. to 3 p.m. shift or on the 3 p.m. to 11 p.m. shift. (ECF No. 72-6.) One employee, Riley Clayton, was scheduled to work one of the two day shifts every week for one fifteen-week period and for fourteen weeks over another twenty-one-week period. (<u>Id.</u>) Another employee, Robert Renshaw, was

scheduled to work during the day seventeen weeks out of the twenty-eight weeks of his employment that are documented in the work schedules. (Id.) Based on this evidence, a reasonable juror could conclude that Bryce's refusal to permit Smith to return to the day shift amounted to unfavorable treatment compared to her similarly-situated co-workers. Smith has therefore succeeded in establishing a *prima facie* case of disability discrimination.

d.   *Bryce's Justification and Whether It Was Pretextual*

Because Smith has established a *prima facie* case of disability discrimination, the burden shifts to Bryce to articulate a nondiscriminatory reason for its action. Ford Motor, 782 F.3d at 767 (citing St. Mary's, 509 U.S. at 507). If Bryce can do so, then the burden shifts back to Smith to establish that Bryce's articulated reason was pretextual. Id. In the Sixth Circuit, plaintiffs are permitted to show pretext in three ways: 1) the proffered reasons have no basis in fact; 2) the proffered reasons did not actually motivate the employer's action; or 3) they were insufficient to motivate the employer's action. Romans v. Mich. Dep't of Human Servs., 668 F.3d 826, 839 (6th Cir. 2012) (citing Chen v. Dow Chem. Co., 580 F.3d 394, 400 (6th Cir. 2009)). A plaintiff cannot establish pretext if the employer had an "honest belief" in the nondiscriminatory basis for its employment decision. Majewski v. Automatic Data Processing, Inc., 274 F.3d

1106, 1117 (6th Cir. 2001). Instead, a plaintiff must show not only that the employer's reason was false, but also that discrimination was the real reason for the adverse action. <u>Barlia v. MWI Veterinary Supply, Inc.</u>, 721 F. App'x 439, 448 (6th Cir. 2018) (citing <u>Tingle v. Arbors at Hilliard</u>, 692 F.3d 523, 530 (6th Cir. 2012)).

Since Smith's termination, Bryce has proffered several justifications for its actions. Initially, Smith's termination was deemed a "voluntary resignation." (ECF No. 77-1 at PageID 969.) According to Williamson, this was because "she did not come to work her scheduled shift." (<u>Id.</u>) When asked what days Smith did not come into work, however, Williamson testified, "At the time this [interrogatory answer] was put together, that's what we believed to be the course of events. We have since later learned differently that there was communication between Nedra and Allison." (<u>Id.</u> at PageID 973.) Those communications consisted of several emails exchanged between Smith and Hatfield in the days leading up to the termination. On Wednesday, August 7, Smith asked when she would be able to return to work. (ECF No. 72-16 at PageID 783.) Hatfield told Smith that she needed to present something in writing saying she was able to work either shift. (<u>Id.</u> at PageID 784.) On Thursday, August 8, Smith said she was not able to get a doctor's note on such short notice, but that she had an appointment

scheduled that Saturday. (Id. at PageID 782.) Hatfield responded, "I will extend the request until Saturday." (Id.) On Friday, August 9, Smith said, "My doctor said he would not lift the restriction. So, I can't bring any other documentation in. Will I be allowed to return to work on Monday?" (Id. at PageID 779.) On Monday, August 12, Smith emailed again and said, "I haven't heard anything from Rob concerning my schedule yet. Am I going to be allowed to return to work today?" (Id. at PageID 787.) She went on to say that both her doctors would be retaining their restrictions on her working the night shift. (Id.) At that point, Hatfield spoke to Smith on the phone and terminated her. Based on this exchange, and on Williamson's own admission, a reasonable jury could find Bryce's stated justification that Smith refused to attend her scheduled shifts was false. Smith did not refuse to attend her scheduled shift; she was not allowed to return until she had documentation lifting her restriction.

Smith has also presented evidence that discrimination motivated Bryce's actions. During the phone call in which Smith was terminated, Hatfield asked her, "So, what you're saying is the doctor's not lifting your restrictions?" (ECF No. 86.) Smith said that he was not. (Id.) Hatfield replied, "because of that, um, we're not able to continue employment unfortunately." (Id.) If believed by the jury, this conversation shows that Smith's

termination was motivated by a desire to avoid accommodating her disability. Smith has therefore met her burden of demonstrating that Bryce's articulated justification was pretextual. For that reason, Bryce's motion for summary judgment as to this claim is denied.

### 2.   Failure to Accommodate

Smith's second claim under the ADA is that Bryce failed to accommodate her disability. Unlike disability discrimination claims, failure-to-accommodate claims "necessarily involve direct evidence," and therefore the McDonnell Douglas burden-shifting framework does not apply. Kleiber v. Honda of Am. Mfg., Inc., 485 F.3d 862, 868-69 (6th Cir. 2007). To make a *prima facie* showing of failure to accommodate, Smith must show that 1) she was disabled; 2) she was qualified for the position, with or without a reasonable accommodation; 3) Bryce knew or had reason to know of her disability; 4) Smith requested a reasonable accommodation; and 5) Bryce failed to provide the accommodation. Johnson, 443 F. App'x at 982. If Smith makes this showing, the burden shifts to Bryce to show that the proposed accommodation would impose an undue hardship on its business. Brownlow v. Alfa Vision Ins. Co., 527 F. Supp. 3d 951, 956 (M.D. Tenn. 2021) (citing Brumley v. United Parcel Serv., Inc., 909 F.3d 834, 839 (6th Cir. 2018)).

- 40 -

As discussed above, there is sufficient evidence that a reasonable jury could find that Smith was disabled and that Bryce knew or had reason to know that she was disabled. There is also no dispute as to whether Smith was qualified. Additionally, it is undisputed that Bryce did not provide Smith with the accommodation that she requested. Smith was not permitted to work during the day after presenting Bryce with her doctor's note. (ECF No. 86.) Instead, she was terminated. (Id.)

Bryce does appear to dispute that Smith's request to work the day shift was a request for accommodation at all. In its briefs, Bryce writes that the reason Smith wanted to work days was to avoid leaving her daughter home alone at night. (ECF No. 71.) It states that "the Plaintiff's issue here is one of making appropriate childcare arrangements for her daughter, it has absolutely nothing to do with any disability that she may suffer." (Id.) It further argues that Smith's request to work during the day was a means to avoid working with employees she believed were harassing her. (Id.) Additionally, Williamson testified that he viewed Dr. Cassius's note as "a recommendation," not "a medically necessary accommodation." (ECF No. 77-1 at PageID 954-55.) To him, "there was no medical restriction that was in place." (Id. at 957.)

In the Sixth Circuit, an employee is not required to use "magic words" such as "accommodation" or "disability" in order to

- 41 -

show that they requested an accommodation. Fisher v. Nissan N. Am., Inc., 951 F.3d 409, 419 (6th Cir. 2020) (citing Smith v. Henderson, 376 F.3d 529, 535 (6th Cir. 2004)). Instead, the request needs to "make it clear from the context that it is being made in order to conform with existing medical restrictions." Leeds v. Potter, 249 F. App'x 442, 449-50 (6th Cir. 2007) (citing Smith, 376 F.3d at 535). What matters under the ADA is whether the employee "provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." Chaniott v. DCI Donor Servs., Inc., 481 F. Supp. 3d 712, 726 (M.D. Tenn. 2020) (citing Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir. 1999)). In this case, Smith presented a note from a doctor that identified both the disabilities for which she was being treated and a modification to her schedule that would improve her symptoms. (ECF No. 72-15 at PageID 778.) Bryce was aware of this note and the scheduling request therein. (ECF No. 72-16 at PageID 784.) It was also aware that she had taken a period of disability leave related to PTSD. (ECF No. 72-8 at PageID 610-11.) This is sufficient evidence upon which a reasonable jury could find that Bryce was aware this note constituted a request for accommodation.

The undersigned also finds that there is a genuine dispute regarding whether the accommodation Smith requested was

reasonable. "Whether an accommodation is reasonable is a 'highly fact-specific' inquiry." Springer v. Metro. Gov't of Nashville & Davidson Cnty. by & through Elec. Powerboard, 569 F. Supp. 3d 724, 730 (M.D. Tenn. 2021) (quoting Anderson v. City of Blue Ash, 798 F.3d 338, 356 (6th Cir. 2015)). In this case, the requested accommodation was a restriction to working only daytime shifts. Although not dispositive, the ADA states that reasonable accommodations may include "modified work schedules." 42 U.S.C.A. § 12111(9)(B). Furthermore, Bryce had at least temporarily permitted its other employees to work only on the day shift. (ECF No. 72-6.) One employee in particular was permitted to work only on the day shift for a period of months as an accommodation for a physical disability. (ECF No. 77-1 at PageID 949.) Based on all of this evidence, a reasonable jury could find that Smith's request for the same accommodation was reasonable. Smith has therefore succeeded in establishing a *prima facie* case of failure to accommodate.

The burden therefore shifts to Bryce to show that granting Smith her accommodation would have imposed an undue hardship on its business. Bryce's evidence makes general references to the impact of "the production needs of the company" on scheduling. (ECF No. 72-1 at PageID 401.) However, Bryce does not provide an explanation as to why permitting Smith specifically to work on the

day shift would pose an undue hardship. It is undisputed that Smith and other Bryce employees were at least occasionally permitted to switch from the night shift to the day shift, and there is no evidence to suggest that these past changes had imposed an undue hardship. Bryce has therefore not met its burden, and its motion for summary judgment on this claim is denied.

### 3.   Failure to Engage in the Interactive Process

In the Sixth Circuit, failure to engage in the interactive process does not give rise to an independent claim. Instead, "it is a violation of the ADA only if the plaintiff establishes a *prima facie* case of failure to accommodate." Thompson v. Fresh Prod., LLC, 985 F.3d 509, 525 (6th Cir. 2021). When an employee requests an accommodation, "the employer has a duty to engage in an 'interactive process' to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" Melange v. City of Center Line, 482 F. App'x 81, 84 (6th Cir. 2012) (citing Kleiber, 485 F.3d at 871). The interactive process is mandatory, and "both parties have a duty to participate in good faith." Kleiber, 485 F.3d at 871. When a party fails to participate in good faith, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." Kleiber, 485 F.3d at

871 (quoting <u>Bultemeyer v. Fort Wayne Cmty. Schs.</u>, 100 F.3d 1281, 1285 (7th Cir. 1996)).

As discussed above, Smith has made a *prima facie* case of failure to accommodate, and thus she may also raise failure to engage in the interactive process as an independent violation of the ADA. The undersigned finds that Smith has established a genuine dispute regarding whether Bryce failed to engage in the interactive process. Smith first met with Morrow to explain her medical concerns about working the day shift. (ECF No. 77-2 at PageID 998.) Morrow directed her to get a doctor's note, and Smith did so. (<u>Id.</u>) She presented that note to Hatfield and Williamson. (<u>Id.</u> at PageID 998-99.) After this meeting, Hatfield asked Smith to produce something in writing stating that the restriction was lifted. (ECF No. 72-16 at PageID 784.) There is no evidence that Bryce tried to identify other "potential reasonable accommodations that could overcome [Smith's] limitations." <u>Melange</u>, 482 F. App'x at 84. The record does not show that the interactive process continued at all. When Smith could not get that particular restriction lifted – and actually had a second doctor endorse it – Hatfield informed Smith that she would be let go. A reasonable jury could find that Bryce was the cause of this breakdown in the interactive process. Summary judgment as to this claim is therefore denied.

    4.   <u>Retaliation</u>

Smith's final claim under the ADA is retaliation. (ECF No. 31.) In order to present a *prima facie* case of retaliation, Smith must establish that 1) she engaged in a protected activity under the ADA; 2) Bryce knew of this activity; 3) Bryce took adverse action against Smith; and 4) there was a causal connection between the protected activity and the adverse action. A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ., 711 F.3d 687, 697 (6th Cir. 2013). This burden is "not onerous, but one easily met." Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000).

First, the undersigned finds that Smith has presented sufficient evidence to establish a *prima facie* case that she engaged in a protected activity. Under the ADA, requests for accommodation are protected acts. Anderson v. Detroit Transp. Corp., 435 F. Supp. 3d 783, 798 (E.D. Mich. 2020) (citing A.C., 711 F.3d at 698). As discussed above, a reasonable jury could find that Smith's request to be scheduled to work during the day was a request for accommodation. Second, Bryce knew of Smith's request. The accommodation was discussed in a meeting with Morrow, in a separate meeting with Williamson and Hatfield, over emails with Hatfield, and on the phone with Hatfield. Throughout the course of these conversations, Bryce's leadership was made aware of Smith's request to work on the day shift, and later, her doctor's note

- 46 -

stating the same. Third, as discussed previously, Bryce took an adverse action against Smith by terminating her.

Finally, as to the fourth element, the undersigned finds that Smith has made a *prima facie* case that there was a causal connection between Smith's request for accommodation and her termination. Smith was told via email that she would not be allowed to return to work until she provided a doctor's note stating she could work without accommodation. (ECF No. 72-16 at PageID 784.) When Smith told Bryce that she could not provide such a note, she was terminated. (ECF No. 86.) On the phone call during which Hatfield terminated Smith, she asked, "So, what you're saying is the doctor's not lifting your restrictions?" (Id.) Smith replied that he was not. (Id.) Hatfield then told Smith, "Because of that, um, we're not able to continue employment." (Id.) Bryce's human resources manager expressly told Smith that she was being terminated "because" Smith's doctor would not lift her restrictions. (Id.) Based on this evidence, a reasonable jury could find that Smith's termination was causally connected to her request for accommodation. Bryce's motion for summary judgment as to this claim is therefore denied.

## C.   Title VII Claim

In addition to her ADA claims, Smith also argues that she was subject to sex discrimination in violation of Title VII. Like

- 47 -

disability claims, sex discrimination claims based on circumstantial evidence are analyzed under the McDonnell Douglas burden-shifting framework. Raadschelders v. Columbus State Cmty. Coll., 377 F. Supp. 3d 844, 856 (S.D. Ohio 2019). Under this framework, Smith must first establish a *prima facie* case of discrimination. Jackson v. VHS Detroit Receiving Hosp., Inc., 814 F.3d 769, 776 (6th Cir. 2016) (citing White v. Baxter Healthcare Corp., 533 F.3d 381, 391 n.5 (6th Cir. 2008)). To make a *prima facie* showing of discrimination, Smith must show that 1) she is a member of a protected class; 2) she was subjected to an adverse employment decision; 3) she was qualified for the position, and 4) she was either replaced by a person outside the protected class, or similarly-situated non-protected employees were treated more favorably. Vincent v. Brewer Co., 514 F.3d 489, 494 (6th Cir. 2007). Once Smith has made such a showing, the burden shifts to Bryce to offer a legitimate, non-discriminatory reason for her termination. Jackson, 814 F.3d at 776. Finally, the burden shifts back to Smith to show that the proffered reason was pretextual. Id.

Bryce does not appear to dispute that Smith was a member of a protected class, nor that she was qualified for the position. (ECF No. 71.) Instead, it argues that Smith was not subject to an adverse employment action because "Defendant's denial of

Plaintiff's request to work only on day shift does not qualify." (Id.) What this assertion omits is that Smith's request was not only denied, but also resulted in her termination. (ECF No. 86.) Regardless of whether the denial of a scheduling request constitutes an adverse employment action, termination qualifies. White, 533 F.3d at 402. Smith has therefore made a *prima facie* showing as to the first three elements.

Smith has also presented evidence that she was treated less favorably than similarly-situated, non-protected employees. As discussed above, to establish that someone is similarly situated, Smith only needs to show that she and her comparator were similar in all relevant respects, including that they dealt with the same supervisor, were subject to the same standards, and engaged in the same conduct without circumstances that would distinguish Bryce's treatment of them. Goldblum, 62 F.4th at 255; Younis, 610 F.3d at 364. For the purposes of her sex discrimination claim, Smith's comparator is a fellow bag-maker helper named Ben Erickson. (ECF No. 72-9 at PageID 660-662.) Erickson, like Smith, worked under Rob Coleman and was subject to Bryce's shift-bumping policy. (Id.) Additionally, like Smith, Erickson suffered from a disability. (ECF No. 77-1 at PageID 981.) According to Williamson, Erickson's "doctor restricted his work activities during the night shift" and "that restriction was honored; he worked only the day shift[.]"

- 49 -

(Id.) Bryce's work schedules confirm that Erickson was solely scheduled on the day shift for the fifteen consecutive weeks leading up to Smith's termination. (ECF No. 72-9.) Thus, unlike Smith, Erickson was not terminated after seeking an accommodation allowing him to work only on the day shift. Based on this evidence, a reasonable juror could find that Smith was treated less favorably than similarly-situated employees. Smith has therefore succeeded in establishing a *prima facie* case of sex discrimination.

The burden now shifts to Bryce to offer a "legitimate, non-discriminatory" reason for Smith's termination. Jackson, 814 F.3d at 776. Bryce claims that "Plaintiff's employment was terminated after she repeatedly refused to return to work when advised that Bryce could not grant her request to work day shift." (ECF No. 71.) Because Bryce has stated a non-discriminatory reason for Smith's termination, the burden shifts back to her "to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." Jackson, 814 F.3d at 776 (quoting White, 533 F.3d at 391-92) (internal quotations omitted). The appropriate question is "whether there exists a genuine issue of material fact." Provenzano v. LCI Holdings, Inc., 663 F.3d 806, 813 (6th Cir. 2011).

As discussed at length above, Smith has provided sufficient evidence to persuade a reasonable jury that Bryce's stated reason

- 50 -

for terminating her was false. Whether that reason was a pretext for sex discrimination is a closer question. See St. Mary's, 509 U.S. at 515 ("But a reason cannot be proved to be "a pretext *for discrimination*" unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.") (emphasis in original). Smith was told she was being terminated "because" her doctor would not lift her restrictions. (ECF No. 86.) The restrictions in question were to work solely on the day shift. This is the same accommodation that was requested, and honored, in the case of Ben Erickson, a male employee in the same position as Smith and with less seniority. (ECF No. 77-1 at PageID 981.) There is no explanation provided in any of the evidence presented that elucidates why Bryce treated these two employees differently. The only difference that is apparent between the two individuals is their sex. Although this evidence is not overwhelming, the undersigned finds that it is at least sufficient to create a genuine dispute of fact as to whether sex discrimination motivated Smith's termination. Bryce's motion for summary judgment as to Smith's sex discrimination claim is therefore denied.

### III. CONCLUSION

For the reasons stated above, Bryce's motion for summary judgment is DENIED.

IT IS SO ORDERED.

- 51 -

s/ Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

April 28, 2023
Date